Mark GABLE a/k/a Mark Pizzuti, Plaintiff,

v.

NATIONAL BROADCASTING COMPANY ("NBC"), a California corporation, Gregory Thomas Garcia, an individual, 20th Century Fox Film Corporation, a corporation, 20th Century Fox Home Entertainment and Does 1 through 10, inclusive, Defendants.

No. CV 08–4013 SVW (FFMx).

United States District Court, C.D. California.

Feb. 22, 2010.

Natasha L. Hill, Steven T. Lowe, Lowe Law, Los Angeles, CA, for Plaintiff.

Eric J. German, Jill Pavian Rubin, Robert H. Rotstein, Mitchell Silberberg and Knupp LLP, Los Angeles, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

STEPHEN V. WILSON, District Judge.

## I. INTRODUCTION

Defendants NBC Universal, Inc., Gregory Garcia, Twentieth Century Fox Film

Corporation, and Twentieth Century Fox Home Entertainment LLC (collectively "Defendants") move for summary judgment against Plaintiff Mark Gable ("Gable" or "Plaintiff"). Plaintiff claims that the television show *My Name is Earl* ("*Earl*") was copied from Plaintiff's screenplay *Karma!* Defendants argue that Plaintiff cannot show that Defendants had access to Plaintiff's screenplay or that the two works are substantially similar; thus, summary judgment should be granted.

For the following reasons, the Court GRANTS Defendants' Motions for Summary Judgment.

## II. FACTS

### A. Background

In late 1994, Plaintiff Gable wrote *Karma!*, a dramatic screenplay about a dirty cop's journey toward redemption. (Plaintiff's Statement of Genuine Issues ["PSGI"] 3–5 [Docket No. 54].) Gable registered the screenplay with the Writer's Guild of America on March 10, 1995. (*Id.* 6.) On September 20, 2004, he registered *Karma!* with the United States Copyright Office. (*Id.* 7.)

In April 1995, Gable, with the help of his girlfriend Cindy Cramer, sent *Karma!* to four talent/literary agents and two friends working in the entertainment industry. (*Id.* 13–15.) Relevant to the current matter, Plaintiff sent the script to David Gersh, a talent agent at The Gersh Agency ("TGA"). (*Id.* 14.) Gersh had not solicited the script and claims to have never heard of it. (Defendants' Statement of Uncontroverted Facts ["DSUF"] 2, 5 [Docket No. 22].) Plaintiff did not receive a response from TGA. (PSGI 25.) Plaintiff has produced no documentary evidence supporting his claim that he sent *Karma!* to TGA.

In 1995, TGA consisted of approximately 20 to 25 agents. (PSGI 32.) One of the agents at TGA during this period was Ken Neisser. (*Id.*) Neisser, a literary agent, represented Defendant Gregory Garcia, the subsequent creator of *Earl.* (Garcia Decl. 6.) Neisser represented Garcia from 1993 until mid–2000, when Garcia left TGA for another agency. (Garcia Decl. 7.)

In the spring of 2000, Garcia left TGA and obtained representation from Creative Artists Agency ("CAA"). (*Id.*) Garcia maintains that he conceived of the idea for *Earl* three years later, in the summer of 2003. (*Id.* 10.) Garcia stated that by the late summer/early fall of 2003, he had drafted portions of the pilot episode for *Earl* and began pitching the concept to various persons working in the television industry. (*Id.* 16.) In the fall of 2004, representatives from NBC Universal ("NBCU") expressed interest in *Earl,* and told Garcia that if he could find an actor to play the title character, "NBC would greenlight the project." (*Id.* 17.) After a lengthy casting process, the actor Jason Lee agreed to play Earl in the spring of 2005. (*Id.* 17.) The pilot for *Earl* first aired on September 20, 2005. (*Id.* 3.) The show is currently in its fourth season. (*Id.*)

In or about September 2005, Plaintiff watched *Earl* on NBC. Plaintiff contends that he was immediately struck by the similarities between *Karma!* and *Earl.* After viewing several episodes, Plaintiff formed the belief that the creator of *Earl* had infringed upon Plaintiff's copyrighted screenplay, *Karma!.*

### B. Overview of *Karma!*

*Karma!* depicts the journey of Frankie Augustus, a dirty cop, who through the help of a guardian angel called "Angel Man," creates good karma for himself and his unborn son by making amends for bad acts in his past. Frankie is a sarcastic forty-year-old Italian American with no

moral compass. The opening scenes of Karma! depict Frankie taking bribes from a drug dealer, his subsequent arrest, prison time, and release.

After his release, Frankie is in dire straits. Behind on his rent, he attempts to steal money from a blind street performer, and eventually picks the pocket of a man on the subway. Disgruntled with the small amount of money in the stolen wallet, Frankie thumbs through the wallet to find a picture of an angel. Frankie stares at it, and states:

> A picture of an angel, well that's appropriate. Anyone with a buck and some chump change, better have an angel to pray too [sic], huh? ... Yea! Well Mr. Guardian angel where are you now?! I stole your buddies [sic] wallet right under his nose and you're nowhere to be found. Shit! I'm hip to your shit!! ... You ever hear of angel dust? That's what's you're gonna be. Actually I wouldn't mind a hit of that right now. A little numbness would do me some good.

(Decl. of Jill Rubin, Exh. D., pg. 82–83 [*Karma!* screenplay].) As Frankie speaks, he attempts to light the picture on fire, but it will not ignite. Instead, Frankie looks at the picture and sees the angel shaking his finger at Frankie. Frankie responds by throwing the picture into the wind. The wind carries the picture away over the river, but then carries it back and drops it on Frankie's shoulder. An angel then appears before Frankie.

The script refers to the angel as "Angel Man" and describes him as follows: "[The angel] look's [sic] like a young man about 27 years old. With opalescent skin, and white hair, resembling an albino, and a slender physique, clothed in blue gun metal. There's a solid gold sword hanging from his waist." (*Id.* at 83.) Angel Man warns Frankie that he has "fallen off the path like a stray dog" and asks Frankie to meet him in front of Frankie's mother's grave at twelve midnight the next night. (*Id.*)

The next night, Frankie goes to his mother's grave. It is pouring down rain, and the cemetery is empty. When Angel Man appears, he closes his eyes and makes a prayer with his hands, which instantly stops the rain. Angel Man also brings dying flowers back to life with the wave of his hand. Then, Angel Man tells Frankie that he has come to help Frankie save the soul of his unborn son. Frankie, being single, thinks Angel Man has the wrong person. However, Angel Man tells Frankie that Frankie had sex with a girl named Betty Alonzo who is now pregnant with his child. Angel Man then warns Frankie:

> Your sons soul [sic] is at stake here! Your sons soul [sic] is coming into this world with your karma along with his Mothers [sic]. And I don't think I have to tell you ... Your karmas [sic] not gonna be up for any awards this year!

(*Id.* at 89.) Angel Man then "creates a cloud of mist." (*Id.*) "A picture forms within the cloud revealing Frankies [sic] unborn son at the age of ten years old. It's obviously Frankies son [sic] he looks just like Frankie. Seemingly destined to follow Frankies [sic] footsteps his son is brandishing a stolen 38 odd special in front of his friends." (*Id.*)

Frankie asks what he can do to save his son's soul. Angel Man responds with three instructions: (1) "make amends with the people you've really hurt in the past," (2) "get your life together, stop stealing, stop taking drugs, and get a straight job as soon as possible," and (3) "in the very near future you're going to come into some wealth, use it wisely." (*Id.* at 91.)

After his meeting with Angel Man, Frankie begins to follow Angel Man's instructions. Frankie refuses to take drugs, calls a friend and admits stealing money from her, and then visits an ex-girlfriend

to confess that he had an affair with her sister while they were dating. Frankie then goes to Times Square where he sees a man drop his wallet. Frankie picks up the wallet, and instead of stealing it, he gives the wallet back to the man. The man then introduces himself to Frankie, and offers him a job as a bartender.

Frankie then purchases a lottery ticket and a scratcher from a liquor store.[1] Frankie wins three hundred dollars from the scratcher. Frankie flashes back to Angel Man telling him to use it wisely. Accordingly, Frankie buys teenagers some candy that they were about to steal, and revisits the blind street performer, this time putting money into his tin instead of taking it out.

As the screenplay continues, Frankie again runs into the blind street performer, but this time the street performer has been shot. After Frankie assists the blind man, the blind man turns into Angel Man. Angel Man assures Frankie that he is on the right path, and tells Frankie that "God believes he can resurrect all of his sons who have fallen." Angel Man tells Frankie that wealth will still follow.

In another scene, it appears that Angel Man is watching Frankie's progress. Frankie is walking down a deserted alley at night and hears a cat's meow coming from a row of trash cans. Frankie searches through the cans and finds an abandoned kitten. He rescues the kitten and takes it home to his friend, Tori Ann. Angel Man watches the entire scene, smiling.

Throughout this period, Frankie is staying with Toni Ann, a drug-using struggling model. Tori Ann is 13–years younger than Frankie and becomes his love interest. Tori Ann observes the changes that Frankie is making in his life, and eventually, she decides to turn her life around too. She tells Frankie that she is going to clean up her act, stop selling drugs, get a job, and join a recovery program. Frankie tells Tori Ann how proud he is of her, and they make love passionately.

Eventually, Frankie is approached by a drug dealer named James Randson. James demands that Frankie act as a drug courier for one of his shipments. Frankie takes this opportunity to redeem himself as a police officer. Frankie visits his old lieutenant at the police station, and offers to go undercover to clear his name by bringing in the bust.

Before leaving for the drug deal, Frankie learns that he has won two million dollars from the lottery. Undeterred, Frankie follows through as an undercover officer. The drug deal does not go as originally planned, but Frankie successfully arrests the drug dealers by himself. Upon leaving the bust, Frankie visits his brother, Augustus, a priest who had earlier told Frankie of an orphanage that had burnt down. Frankie offers to give one million dollars to rebuild the orphanage.

Frankie returns to Toni Ann's apartment and is immediately attacked by James and his bodyguards. James enters the apartment and shoots Frankie three times. Toni Ann bursts from the closet shooting back at the intruders. As James gets a straight shot at Toni Ann, Angel Man appears and wraps his wings around her, blocking all the bullets. Toni Ann then fires her gun and kills James. Toni Ann rushes to Frankie, but is too late. Frankie tells Tori Ann that he will always love her, and the scene fades to black. Then, Frankie appears with white wings and clothed like Angel Man. Angel Man

1. The lottery ticket is of the kind where the customer picks numbers, and then the winning numbers are called later that night. The scratcher is a ticket where the customer takes a coin and scratches off a covering to reveal whether money is won.

tells Frankie that he's earned his wings back and that it is time to "cross over." The screenplay concludes with Frankie as an angel standing watch over Toni Ann as she sleeps.

## C. Overview of *Earl*

The pilot episode of *Earl* begins with a family pulling up to a convenience store as the main character, Earl Hickey ("Earl"), enters the store. The family waits until Earl leaves the convenience store for fear of going in at the same time as Earl. When Earl exits, the family enters, only to have Earl break into the family's car. Throughout this whole opening, Earl narrates that he is the type of guy who will pretty much steal anything that is not nailed down.

Earl then goes on to narrate his relationship with the other characters in the show. As he introduces the characters, we see flashbacks of the instances he is narrating. First, Earl introduces Joy, who Earl drunkenly married during a one night stand in Las Vegas. Earl describes himself as being so drunk that he did not notice that Joy was actually six months pregnant when they were married. Earl explains that a few years later, Joy became pregnant again. Initially, Earl believed Joy was carrying his child; however, when the child is born, Earl sees that the child is partially African American. As Earl and Joy are both white, Earl realizes that the child, named Earl Jr., is not his own. Earl also introduces Randy, his dimwitted brother. Joy, Randy and Earl all hang out at Ernie's crab shack. At the crab shack, they are served by Darnell, who Earl calls "Crabman."

Earl narrates that three weeks prior, he bought a scratcher lottery ticket, and won $100,000. The audience sees a flashback of Earl celebrating his win, and then immediately getting hit by a car. Lying on the asphalt, Earl sees his lottery ticket fly away. While recuperating in the hospital,

Joy divorces Earl and announces that Darnell, "Crabman," is actually Earl Jr.'s father.

Lying alone in the hospital, Earl watches the Carson Daly Show. On the show, the guest asks Daly how he has such a good life. Daly responds: "What goes around comes around, and that's how I try to live my life. You do good things and good things happen to you, you do bad things and it'll come back to harm you. It's karma."

Once Earl is out of the hospital, Earl and Randy check into a motel, where they make friends with the maid, Catalina. Earl adopts Daly's theory of karma, and puts it into action. Earl explains: "If I want a better life, I need to be a better person." Accordingly, Earl makes a list of everything bad he has ever done. He explains that "I just won a hundred thousand dollars in the lottery and was immediately hit by a car. I almost died because something good happened to me that I didn't deserve. That karma stuff is going to kill me, unless I make up for everything on that list."

On the list are specific acts, such as "peed in the back of a cop car," as well as general bad habits, such as "harmed and killed innocent people with second hand smoke." Earl decides that the first wrong he is going to make amends for is his picking on Kenny James in elementary school. Earl's idea is to find Kenny, do something nice for him, and then cross him off the list.

As Earl describes his new theory of life, the very $100,000 scratcher that flew away from Earl when he was hit by the car flies back to him. Earl responds: "Son of a bitchit's working."

Earl and Randy then turn to finding Kenny. As Earl reminisces about tormenting Kenny, we see flashbacks of Earl

bullying Kenny by kicking Kenny in the groin on a kickball field. Back in the present, Earl decides to watch Kenny for a few days. Earl concludes that Kenny is lonely, and that Earl will help Kenny by finding him a companion. Eventually, Earl and Randy find out that Kenny is gay. In response, Earl and Randy run from Kenny, and Earl states that he does not have to help Kenny because he is homosexual. However, when they reach their hotel room, they find Joy. Joy has ransacked the room looking for the lottery money. As Earl and Randy enter the room, Joy hits them on the head with a telephone.

Earl interprets Joy's breaking into his room as a sign from karma that he cannot give up on Kenny just because he is gay. Earl eventually helps Kenny find companionship by taking Kenny to a gay bar in the city. At the end of the episode, Kenny tells Earl that he was scared to be who he really was, but that he no longer is scared because of Earl's kindness. Kenny states: "When we were kids, you took away my confidence, but today you gave it back . . . You can cross me off your list."

Thereafter, each episode follows a similar formula with Earl choosing one item off his list, and setting out to amend for his actions. Each episode starts out with the same narration:

> You know the kind of guy who does nothing but bad things, and then wonders why his life sucks. Well, that was me. Every time something good happened to me, something bad was always waiting around the corner. Karma. That's when I realized I had to change. So I made a list of everything bad I've ever done. And one by one I'm going to make up for all my mistakes. I'm just trying to be a better person. My name is Earl.

Episodes in the first season include: Earl making amends for faking his own death to get out of a relationship by telling the woman that he is still alive; Earl making up for teasing people with accents by teaching English to immigrants; Earl redeeming himself for burning down a barn at a local camp for wayward boys; and Earl helping Joy win a beauty pageant in order to make up for an award Earl once broke. As Earl works through the items on his list, he often commits additional wrongs, adding them to his seemingly never-ending tally.

## III. ANALYSIS

### A. Legal Standard

Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir.1997).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). That burden may be met by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial. *See id.* at 323–34, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir.2000). Only genu-

ine disputes—where the evidence is such that a reasonable jury could return a verdict for the nonmoving party—over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 919 (9th Cir.2001) (the nonmoving party must identify specific evidence from which a reasonable jury could return a verdict in its favor).

## B. Copyright Infringement

To establish copyright infringement, Plaintiff must show that he owns a valid copyright in *Karma!,* and that Defendants copied protected expressions from it. *See Kouf v. Walt Disney Pictures & Television,* 16 F.3d 1042, 1044 n. 2 (9th Cir.1994). For the purposes of summary judgment, Defendants do not dispute that Plaintiff owns a copyright in *Karma!* Thus, the only question before the Court is whether Defendants copied protected expressions from the work.

To prove copyright infringement, Plaintiff must show that Defendants copied protected elements of *Karma!* either through evidence of direct copying or through a showing that Defendants had "access" to Plaintiff's copyrighted material and that the two works at issue are "substantially similar." *See Funky Films, Inc. v. Time Warner Entertainment Co., L.P.,* 462 F.3d 1072, 1076 (9th. Cir.2006); *Three Boys Music Corp. v. Bolton,* 212 F.3d 477, 481 (9th Cir.2000). Here, Plaintiff does not allege direct copying by Defendants; rather Plaintiff contends that Garcia had ac-cess to *Karma!* through TGA, and that the works are substantially similar.

■ The required elements of access and substantial similarity are related— that is, the plaintiff's burden of proof on each element rests partly on the strength of his showing on the other element. Thus, in rare cases, a plaintiff can prove copying even without proof of access "if he can show that the two works are not only similar, but are so strikingly similar as to preclude the of independent creation." *Meta–Film Assoc., Inc. v. MCA Inc.,* 586 F.Supp. 1346, 1355 (C.D.Cal.1984) (citing 3 Nimmer on Copyright § 13.01[B] and *Ferguson v. Nat'l Broadcasting Co., Inc.,* 584 F.2d 111, 113 (5th Cir.1978)). In such instances, access will be inferred from the "striking" similarities between the works. *Id.* This rule only applies, however, where "as a matter of logic, the only explanation [for the similarities] between the two works must be 'copying rather than … coincidence, independent creation, or prior common source.'" 4–13 Nimmer on Copyright § 13.02[B] (2009) (citations omitted).

Conversely, under the "inverse ratio rule" recognized by the Ninth Circuit, courts "require a lower standard of proof of substantial similarity when a high degree of access is shown." *Three Boys Music,* 212 F.3d at 485.[2] To benefit from this rule, Plaintiff must offer proof of access which is greater than or "more compelling than that which is offered in the usual copyright case." *Idema v. Dreamworks, Inc.,* 162 F.Supp.2d 1129, 1176 (C.D.Cal.2001) (holding that the inverse ratio rule did not apply because "the general unavailability of plaintiffs' works, es-

---

**2.** It should be noted that the inverse ratio rule only works in one direction—that is, while a strong showing of access will result in a lower threshold showing of substantial similarity, a weak showing of access does not require a greater showing of similarities between the plaintiff's and defendant's works. *Three Boys Music,* 212 F.3d at 486 ("We have never held, however, that the inverse ratio rule says a weak showing of access requires a stronger showing of substantial similarity.")

pecially those that were unpublished, other than by way of their alleged 1994 and 1995 submissions to [defendants] makes 'access' to plaintiffs' copyrighted works somewhat *less* than might be available in a large number of cases.") (emphasis in original). Conversely, where plaintiff's theory of access is based solely on "speculation, conjecture or inference," plaintiff cannot demonstrate the high degree of access necessary to invoke the inverse ratio rule. *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1178 (9th Cir.2003); *see id.* Finally, in Ninth Circuit cases applying the inverse ratio rule, generally the defendant concedes that he or she had access to plaintiff's copyrighted work; and this "concession of access ... [is] a prominent factor in [the court's analysis]." *Rice*, 330 F.3d at 1178 (citing to *Shaw v. Lindheim*, 919 F.2d 1353, 1361–62 (9th Cir.1990) and *Metcalf v. Bochco*, 294 F.3d 1069, 1075 (9th Cir.2002)).[3]

### 1. Access[4]

■ To prove access, Plaintiff must show that the Defendants had a "reasonable opportunity" or "reasonable possibility" of viewing Plaintiff's work prior to the creation of the infringing work. *Three Boys Music*, 212 F.3d at 482; *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir.

1987). Reasonable access requires more than a "bare possibility," and "may not be inferred through mere speculation or conjecture." *Three Boys Music*, 212 F.3d at 482. "In order to support a claim of access, a plaintiff must offer 'significant, affirmative and probative evidence.'" *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir.2003) (affirming summary judgment against the plaintiff on the issue of access where the plaintiff produced "no reasonable documentation that he actually mailed [tapes of the allegedly infringed work]") (citing *Scott v. Paramount Pictures Corp.*, 449 F.Supp. 518, 520 (D.D.C. 1978)).

Access is often proven through circumstantial evidence in one of two ways: "(1) a particular chain of events is established between the plaintiff's work and the defendant's access to that work ... or (2) the plaintiff's work has been widely disseminated." *Idema*, 162 F.Supp.2d at 1175 (citing to *Three Boys Music*, 212 F.3d at 482). Here, Plaintiff does not contend that his screenplay was widely distributed; instead, Plaintiff attempts to prove access by establishing a chain of events linking Plaintiff's screenplay with Defendants' work.

3. Even in cases in which the inverse ratio rule applies, it is not clear just how much less the showing of substantial similarity need be, given the high degree of access shown. In *Shaw*, the Ninth Circuit applied the inverse ratio rule where defendants conceded access to plaintiff's script. 919 F.2d at 1361–62. However, the court merely held that the high degree of access was "a factor to be considered in favor of [plaintiff]." *Id.* at 1362. In contrast, *Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir.2002), suggests that the plaintiff receives a greater benefit from the inverse ratio rule. In *Metcalf*, where the writer of the infringing work admitted that he received and read three versions of plaintiff's work and passed it on to the star actor in the infringing work, the court found that "[plaintiffs'] case is strengthened considerably by [defendant's]

concession of access to their works." 294 F.3d at 1075. The court stated that if the trier of fact were to believe that the defendants read the scripts, "it could similarities between plaintiffs' script and defendants' copying, not mere coincidence." *Id.*

Although the exact effect of the inverse ratio rule is unclear, in this case, plaintiff has not introduced sufficient evidence of access to invoke the inverse ratio rule (see *infra* section III.B.1); thus, the Court need not resolve this issue.

4. Plaintiff does not argue that *Earl* and *Karma!* are so strikingly similar so as to allow plaintiff to prevail without a showing of access. Indeed, for the reasons discussed *infra* section III.B.2, the Court holds that the works are not strikingly similar.

Specifically, Plaintiff argues that the creator of *Earl*, Garcia, had access to *Karma!* through Plaintiff's submission of the screenplay to TGA in mid–1995.[5] Plaintiff offers his own declaration and that of his girlfriend Cindy Cramer, who assisted him with the mailing, as evidence that Plaintiff mailed *Karma!* to Gersh at TGA in the spring of 1995. However, Plaintiff has produced no documentary evidence of the mailing. Further, there is no evidence that Plaintiff received any response from TGA or that Gersh or anyone at TGA otherwise acknowledged receipt. This lack of documentation regarding the mailing weighs in favor of granting summary judgment. *See Jorgensen*, 351 F.3d at 52 (affirming summary judgment where the plaintiff "did not maintain a log of where and when he sent his work, or keep receipts from certified mailings to establish a chain of access") (internal citations omitted); *see also Rice*, 330 F.3d at 1178. Both Gersh and Neisser deny ever receiving or reading any submission from Plaintiff, including *Karma!* (Gersh Decl. ¶ 5; Neisser Decl. ¶ 5.)

Assuming, however, that TGA received the screenplay, Plaintiff argues that once Gersh received *Karma!*, it is reasonable that Garcia, as a client of TGA, would have access to it. Plaintiff offers two theories in support of this proposition. First, Plaintiff argues that Gersh may have given Garcia access to the screenplay directly, as Gersh's name was listed on Garcia's contract with TGA as one of Garcia's key contacts. Second, Plaintiff argues that

there is a reasonable possibility that Gersh or someone else at TGA gave Plaintiff's screenplay to Neisser, another agent at TGA and the literary agent for Garcia, who then could have passed it on to Garcia. Plaintiff does not present any evidence that Gersh or Neisser had any contact with Garcia after Garcia left TGA in 2000; thus, Plaintiff's theory of access assumes that Garcia must have been given access to *Karma!* several years before Garcia claims to have created *Earl*.[6]

The Court holds that Plaintiff's evidence of access is far too weak to trigger the inverse ratio rule.[7] In *Rice v. Fox Broadcasting Company*, the Ninth Circuit rejected application of the inverse ratio rule under analogous facts. 330 F.3d 1170 (9th Cir.2003). In *Rice*, Robert Rice claimed that Fox Broadcasting Company had infringed on Rice's work, *The Mystery Magician*, when Fox developed a series of television specials about magic ("*Specials*"). *Id.* at 1173. Rice claimed that he sent two copies of his work and a pitch sheet for a proposed programming idea to Fox's Senior Vice President of Specials and Alternative Programming, Michael Darnell, who was an active participant in developing the infringing work. *Id.* at 1178. Rice also claimed that the defendants were aware of *The Mystery Magician* because Rice gave copies of the work to his agent at ICM, who in turn sent a copy of the video to Fox. *Id.* Lastly, Rice claimed that when he would visit his own agent at ICM, he "would often chat with Steve Wohl, a fellow agent at ICM, and

---

5. Plaintiff also stated in his declaration that he sent *Karma!* to Creative Artists Agency ("CAA") in 1995, but he did not state who it was sent to. (Gable Decl. ¶ 13.) Although Garcia became a client of CAA in 2000, Plaintiff does not argue that Garcia received access to *Karma!* through CAA, and has offered no evidence to support such a theory.

6. While Plaintiff presents evidence of Garcia's different explanations as to *how* he came up with the idea for *Earl*, Plaintiff does not appear to dispute *when* Garcia created *Earl*— i.e., sometime in 2003. In short, there is no evidence to refute Garcia's testimony that he created *Earl* in 2003.

7. Plaintiff does not argue that the inverse ratio rule applies.

that Wohl repeatedly told Rice that he 'loved' the idea behind *the Mystery Magician* and that it would be a 'smash hit.'" *Id.* Rice reasoned that "[b]ecause Wohl was Bruce Nash's agent, ... [and] Nash ... was an active participant along with Darnell in developing the *Specials,*" Nash had access to *The Mystery Magician. Id.*

The Ninth Circuit rejected Rice's claims. First, regarding the alleged transmission to Michael Darnell, the Court discounted this evidence because there was "no copy of the purported pitch and [plaintiff] never received a response from Fox." *Id.* Second, as to "the complicated thread involving Marks, Wohl, Nash and Darnell," the court noted that Rice had no evidence that Wohl "provided *The Mystery Magician* to Nash, Darnell or anyone else at either Nash Entertainment or Fox." *Id.* As such, the Ninth Circuit found that Rice's claims were "based on speculation, conjecture, and inference which are far less than the 'high degree of access' required for application of the inverse ratio rule." *Id.*

Similarly, here, there is no evidence that: (1) Plaintiff ever received a response from Gersh or anyone at TGA; (2) that Neisser had access to the script himself (either through Gersh or otherwise), or (3) that anyone at TGA transferred the script to Garcia. Finally, there is no concession of access here by Defendants. As such, Plaintiff's chain of events is too speculative to trigger the inverse ratio rule.

■■ Further, Plaintiff cannot create a triable issue of access merely by showing "bare corporate receipt" of his work by an individual who shares a common employer with the alleged copier. *Jorgensen,* 351 F.3d at 52–53; *Meta–Film,* 586 F.Supp. at 1358. Instead, to avoid summary judgment, a plaintiff must show that he submitted his work to an intermediary *who is in a position to transmit the plaintiff's work to the creators of the infringing work. Meta–Film,* 586 F.Supp. at 1355–56. The

intermediary can be a person who (1) has supervisory responsibility for the allegedly infringing project, (2) contributed ideas and materials to it, or (3) worked in the same unit as the creators. *Id.; see, e.g., De Acosta v. Brown,* 146 F.2d 408, 410 (2d Cir.1944) (sufficient evidence of access presented where plaintiff submitted her work to a literary agent who thereafter was consulted by the defendant as to research details regarding the infringing work). At a minimum, however, "the dealings between the plaintiff and the intermediary and between the intermediary and the alleged copier must involve some overlap in subject matter to permit an inference of access." *Meta–Film,* 586 F.Supp. at 1358 (citing *Kamar Int'l Inc. v. Russ Berrie and Co.,* 657 F.2d 1059 (9th Cir.1981) and *Russ Berrie & Co. v. Jerry Elsner Co., Inc.,* 482 F.Supp. 980, 989 n. 7 (S.D.N.Y. 1980)). In sum, the plaintiff must show a sufficient nexus between "the individual who possesses knowledge of a plaintiff's work and the creator of the allegedly infringing work." *Id.* at 1357.

For example, in *Jorgensen,* the Second Circuit affirmed summary judgment as to some defendants on the issue of access where the plaintiff could not produce documentary evidence to show that he mailed out his work, and presented no evidence that those who did receive his work had any relationship with the creators of the allegedly infringing work. 351 F.3d at 52–53. Similarly, in *Meta–Film,* the court granted summary judgment on access where the plaintiff showed his work to a director who was under contract with the defendant studio and worked on the studio lot, but could not demonstrate any connection between the director and the studio's allegedly infringing project. 586 F.Supp. at 1356–59. As the court explained, "countless unsolicited scripts are submitted to numbers of individuals on studio lots everyday." *Id.* at 1357–58. "Under these

circumstances, it is clearly unreasonable to attribute the knowledge of any one individual-especially a non-employee- to every other individual just because they occupy offices on the same studio lot." *Id.* The court in *Meta–Film* also rejected plaintiff's theory that access was shown by the fact that the director to whom she submitted her work had dealings with an executive involved in producing the infringing work. *Id.* at 1358. The court found that the executive did not make any creative contributions to the infringing work and the meetings between the two men had nothing to do with either plaintiff's work or the infringing work. *Id.* Thus, access could not be inferred from those meetings.

Finally, in *Jones v. Blige*, the Sixth Circuit affirmed summary judgment on the issue of access where plaintiff demonstrated that she had sent her work to Andy McKaie, a Senior Vice President at Universal, and the allegedly infringing artists, Mary J. Blige and Andre Young, had a recording contract and a distribution joint venture, respectively, with Universal. 558 F.3d 485, 491–92 (6th Cir.2009). The court held: "While it is true that both Young and Blige dealt with Universal in certain respects, there is no evidence that either they or anyone else involved in the creation of [the allegedly infringing work] had any contact with McKaie or his division ..." *Id.* at 492.

Here, Plaintiff cannot establish more than bare corporate receipt. As noted above, Plaintiff has not introduced any documentary evidence to support the claim that Plaintiff sent *Karma!* to Gersh at TGA, or that the screenplay ever actually reached Gersh. However, even generously assuming that Plaintiff's submission reached Gersh, there is no evidence that Gersh had any contact with Garcia. It was Neisser, not Gersh, who represented Garcia at TGA. (PSGI 28; Neisser Decl. ¶ 2; Garcia Decl. ¶ 6.) Although Gersh's name was listed on Garcia's contract, Gersh testified that he did not have any dealings with Garcia, and there is no evidence that the two ever spoke. (Gersh Decl. ¶ 7.) Further, there is no evidence that Gersh had any supervisory responsibility for *Earl* or any involvement in the creation of the series. These facts clearly cut against a finding of access.

Nonetheless, Plaintiff argues that Gersh may have passed the script along to Neisser, who then may have passed it along to Garcia.[8] Neisser testified in his deposition that he spoke to Gersh on a regular basis and that "TGA was a relatively small ... place." (PSGI 73 [Neisser Depo. 50:22–25; 89:22–89:8].) The evidence demonstrates that 20 to 25 agents worked at TGA in mid–1995. (PSGI 32.) However, there is no evidence that Gersh and Neisser ever worked on any projects together. (*See* PSGI 32–35.) Neisser worked in the "television lit" department, which was relatively autonomous, and Gersh did not oversee

---

**8.** Alternatively, Plaintiff appears to argue (without citation to any relevant authority) that because TGA, the entity, received Plaintiff's screenplay, access can be shown by the fact that Garcia had an agency relationship with TGA. (Opp'n at 23.) Thus, Plaintiff argues that Garcia's access was not through an intermediary in this case because an entity, TGA, with legal authority to represent Garcia received the work. (*Id.*)

Plaintiff's argument makes little sense. TGA, as an entity, cannot give Garcia access to *Karma!*. The case law discussing access addresses whether actual persons are in a position vis-à-vis the creator to allow for reasonable access. Access is not a metaphysical concept, it requires a reasonable possibility that the actual creator(s) has seen (or heard or read) the work which is allegedly infringed. Thus, TGA cannot have access "on Garcia's behalf." Further, Plaintiff's argument is contradicted by the rule that bare corporate receipt does not impute knowledge of such receipt to all persons affiliated with the corporation.

that department or attend its regular meetings. (Pl. Compendium Exh. K [Neisser Depo., at 89:2–19], Exh. J [Gersh Depo., at 46:16–47:16, 49:5–16].) Nonetheless, Neisser testified that TGA had weekly meetings of all the Los Angeles agents, which Gersh sometimes attended. (PSGI 35 [Neisser Depo. at 43:5–21, 89:2–90:2].) Finally, Neisser gave vague testimony that he had meetings with "all three Gershes"[9] about what was going on in the department, about the business" and that they "talked all the time." (PSGI 73.)[10] In sum, viewing the record in the light most favorable to Plaintiff, there is evidence that Gersh, the person allegedly with knowledge of Plaintiff's script, had some meetings or discussions with Neisser, who in turn had a connection with Garcia.

The Court holds that this connection is far too attenuated and speculative to support an inference of access. Although Gersh and Neisser clearly spoke to one another, Plaintiff has not offered any evidence that Gersh and Neisser ever had discussions about *Karma!* or *Earl* or about any other projects that Garcia was working on. Further, there is no showing that Neisser had any involvement or influence in the creation of *Earl.* Thus, there is no evidence that discussions between Gersh and Neisser involved any overlap in the subject matter of discussions between Neisser and Garcia. *See Meta–Film,* 586 F.Supp. at 1358.

In some respects, Plaintiff's theory of access is even more attenuated than that offered in *Meta–Film.* In *Meta–Film,* the plaintiff submitted a script called "Frat Rats" to a movie director, Badham, who specifically acknowledged receipt and admitted to reading the script. *Id.* at 1352. Badham had several meetings with an executive at Universal named Ned Tanen about an unrelated project. *Id.* at 1353. Plaintiff speculated that during these meetings, Badham may have given "Frat Rats" to Tanen or told him about it. *See id.* Tanen, in turn, was instrumental in bringing the allegedly infringing work, "Animal House" to Universal, but there was no evidence that Tanen had creative input in Animal House. *Id.* at 1353. The Court found that Plaintiff's submission to Badham, "as a matter of law, cannot sustain a finding of access." *Id.* at 1359.

Here, unlike the director in *Meta–Film,* Gersh did not acknowledge receipt of *Karma!.* Even assuming he had, however, all Plaintiff can show is that, like Badham and Tanen, Gersh and Neisser had meetings about certain projects and discussed unspecified "business." There is no evidence that they ever discussed Plaintiff's screenplay or any of Garcia's work, and there is

---

9. The "three Gershes" refer to David Gersh, Bob Gersh, and Phil Gersh. Neisser considered all of them to be his bosses at TGA. (Pl. Compendium Exh. J [Gersh Depo. at 24:5–17].)

10. Gersh's deposition testimony, in some respects, differs with Neisser's testimony. Specifically, Gersh testified that TGA had weekly "staff meetings" of the agents, but he could not recall what year those staff meetings began. (Pl. Compendium Exh. K [Gersh Depo. at 44:5–13].) It is not clear whether these are the "all agent meetings" that Neisser was referring to. Gersh also testified that all meetings in the mid–1990s were informal, and that he met with Neisser "very rarely"— generally, once every 3 or 4 months—during that time period. (*Id.* at 46:6–13.) Finally, Gersh testified that he had little, if any, connection with the department Neisser worked in, and "wouldn't really have any reason to have any discussion with him other than a social how are you kind of thing." (*Id.* at 46:10–24.)

For purposes of summary judgment, the Court must view the evidence in the light most favorable to the non-moving party, Plaintiff, in this case. Thus, while the Court does not find Neisser and Gersh's testimony to be flatly inconsistent, as Plaintiff contends, the Court accepts Neisser's testimony for the purposes of this motion.

nothing in the record indicating that Gersh or Neisser had creative influence in *any* of Garcia's projects, much less *Earl*.[11] (*See* Garcia Decl. ¶ 2.) Thus, Plaintiff's theory of access fails as a matter of law.

Before addressing substantial similarity, the Court will address one further argument regarding access. Here, the parties vigorously dispute whether TGA had any formal policy regarding the submission of unsolicited scripts in 1995, when Plaintiff allegedly submitted *Karma!* to Gersh. Gersh and Neisser both declared that, in 1995, TGA had a policy of not considering unsolicited screenplays; instead, such screenplays would be returned to the sender or discarded. (Neisser Decl. ¶ 3; Gersh Decl. ¶ 2.) They also declared that their personal practices were not to consider unsolicited screenplays, but to return or discard them. (Neisser Decl. ¶ 4; Gersh Decl. ¶ 4.) Plaintiff launched several objections to these declarations, and noted that no written TGA policy about unsolicited materials had been produced. (PSGI 42; Pl. Evidentiary Objections [Docket 53].) Finally, Plaintiff also submitted the declaration of expert witness Eric Sherman ("Sherman") regarding the custom and practice of agencies in the mid–1990s relating to unsolicited submissions. Plaintiff argued that, given industry practice, it was highly likely that someone at Gersh read *Karma!* (Opp'n at 28; Sherman Decl. ¶ 8.)

Plaintiff's argument fails for several reasons. First, regardless of whether TGA had an agency-wide policy relating to unsolicited scripts, Neisser and Gersh both clearly testified that it was their personal practice not to consider unsolicited scripts. (Pl. Compendium Exh. K [Neisser Depo. at 52:10–24, 54:1–11, 90:17–92:9]; Suppl. Rubin Decl. Exh. 3 [Neisser Depo. at 96:4–24, 98:8–19]; Pl. Compendium Exh. J [Gersh Depo. at 26:11–27:24]; Suppl. Rubin Decl. Exh. 4 [Gersh Depo. at 20:24–24, 29:25–30:21].) Further, the undisputed evidence demonstrates that Neisser and Gersh instructed their assistants not to accept unsolicited scripts. (*Id.*) Plaintiff has presented no evidence that Gersh or Neisser ever read an unsolicited script.

■ Second, the Court rejects the declaration of Plaintiff's expert, Sherman, as it does not meet the requirements of Federal Rule of Evidence 702. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Sherman declares that he has worked in the entertainment industry for 40 years. (Sherman Decl. ¶ 2.) He has taught classes on, and authored books on, the television and film business. (*Id.*; *see* Pl. Compendium Exh. L [Sherman's Curriculum Vitae].) Finally, Sherman has acted as a consultant to "clients in the entertainment industry," and in that capacity, has contacted different Los Angeles talent agencies on "hundreds" of occasions regarding submitting scripts to persons represented by those agencies. (Sherman Decl. ¶ 3.) Based on this experience, Sherman offers testimony as to the custom of talent agencies regarding unsolicited submissions in the mid–1990s. Sherman opines that, in 1995, the agencies had

---

11. The timing of events also casts doubt on the element of access. Although Plaintiff transmitted his screenplay to TGA before *Earl* was created, eight years passed between Plaintiff's submission and the time Garcia claims to have created *Earl*. Further, there is no evidence that Garcia had any continuing contact with Neisser (or Gersh) after he left TGA in 2000. Thus, in order for Plaintiff's theory of access to be possible, either Gersh or Neisser must have given Garcia access to *Karma!* before Garcia left TGA in 2000, and several years before the creation of *Earl*. While this is certainly not fatal to Plaintiff's claim, see *Three Boys Music*, 212 F.3d 477 (9th Cir.2000), it weighs against the plausibility of Plaintiff's alleged chain of connections.

"widely divergent policies concerning 'unsolicited submissions.'" (*Id.* ¶ 4.) Further, "these policies were far from uniform and by no means rigorously applied in 1995." (*Id.*) Sherman also opines, however, that "the custom and practice in the entertainment industry (circa mid–90's)" is that agents would read unsolicited submissions if the following criteria were met: "(a) when it has a provocative or catchy title; (b) the appearance and/or packaging of the submission is appealing; (c) the name of the author is a familiar name in the industry; (d) the first ten pages are compelling; or (e) the genre is one in which there is a particular need at the time." (*Id.* ¶ 5.) Sherman states that, in his opinion, *Karma!* met four of these five criteria, and therefore likely was read by someone at the Gersh agency. (*Id.* ¶ 8.)

Sherman's expert testimony is not reliable. Sherman first tells the Court that there was *no* standard practice in the industry regarding unsolicited scripts—i.e., the agency policies were "widely divergent"—but then declares that agents generally read unsolicited scripts when some combination of 5 criteria were met. Sherman cannot purport to testify as to a custom and practice without first establishing that such a practice existed. *See United States v. Fredette,* 315 F.3d 1235, 1239–40 (10th Cir.2003) (expert's experience regarding the industry standard for rebate programs gave him "no special insight" into defendant's rebate program where the expert admitted that defendant's program was different than any he had encountered before), *Louie v. British Airways, Ltd.,* Case No. A01–0329, 2003 WL 22769110, at * 10–11 (D.Alaska 2003) (expert affidavit could not establish that defendants' failure to warn violated industry standards where there was no evidence that such a standard existed at the relevant time period); *see also,* 25 C.J.S. Customs and Usages § 45 ("Proof of matters pertaining to custom is not admissible before the existence of the custom has been established by the evidence."). Here, Sherman has completely undermined his own conclusion regarding industry practice.

Further, Sherman offers no support for the 5 criteria he provided; he never explains where such criteria come from or why he believes that talent agents used those criteria in the mid–1990s. Sherman does not identify a single agency he dealt with in the relevant time period, and he offers no testimony related to TGA's practices.[12] Thus, Sherman has not identified the principles and methods that he used to form his opinion, making it impossible for the Court to evaluate whether such methods are reliable. *See* Fed.R.Evid. 702; *In re Canvas Specialty, Inc.,* 261 B.R. 12 (C.D.Cal.2001). Finally, Sherman's opinion that *Karma!* met four of the five criteria he proposed is entirely unsupported and conclusory. He has not offered any evidence regarding how a literary agent would apply these criteria, nor has he offered any examples of instances where his clients' unsolicited scripts were reviewed for these reasons. Sherman's personal opinion that the title of Plaintiff's work is "catchy," that the first 10 pages are compelling, and so on, is not based on specialized knowledge and does not assist the trier of fact. Fed.R.Evid. 702, advisory committee notes (an expert relying primarily on experience must "explain how that experience leads to the conclusion

---

12. Sherman's testimony about the practices of agents at Creative Artists' Agency (CAA) is irrelevant. Plaintiff has not argued that Garcia received access to Plaintiff's script through CAA. Thus, the policies of other agencies are only relevant to the extent that they indicate a standard in the industry and therefore can support a conclusion about TGA. However, Sherman admitted there was no standard industry practice regarding unsolicited scripts among the Los Angeles talent agencies in the mid–1990s.

reached ... and how that experience is reliably applied to the facts"); *Fredette,* 315 F.3d at 1240. The Court therefore disregards Sherman's testimony.[13] *Claar v. Burlington Northern R.R.,* 29 F.3d 499, 502–503 (9th Cir.1994) (trial court may exclude from its summary judgment consideration proffered expert testimony that is not reliable).

In sum, even generously assuming that Plaintiff's submission of *Karma!* actually reached Gersh, the record is insufficient to allow a reasonable jury to infer that Garcia had access to *Karma.* Thus, summary judgment for Defendants is appropriate.

Finally, even if the weak evidence of access were sufficient to create a triable issue of fact, Plaintiff would still have to present evidence allowing reasonable minds to conclude that *Karma!* and *Earl* are substantially similar. As discussed below, Plaintiff has failed to meet this burden.

### 2. Substantial Similarity

In addition to access, the issue of substantial similarity provides an independent ground for granting summary judgment. To determine whether two works are substantially similar, the Ninth Circuit applies a two-part test consisting of extrinsic and intrinsic components. *Rice,* 330 F.3d at 1174. The extrinsic test involves an objective comparison of the two works. The Court must consider "whether [the works] share a similarity of ideas and expression as measured by external, objective criteria." *Swirsky v. Carey,* 376 F.3d 841, 845 (9th Cir.2004). The extrinsic test requires an "analytic dissection" of the works, and is often aided by expert testimony. *Id.*

▮ The intrinsic component of the substantial similarity test is subjective and depends solely on the response of the ordinary lay observer. *Berkic v. Crichton,* 761 F.2d 1289, 1292 (9th Cir.1985). "To that extent, expert testimony or the comparison of the individual features of the works is inappropriate in applying the intrinsic test." *Id.* Instead, the trier of fact "ordinarily decides whether the 'total concept and feel' of the two works is substantially similar." *Id.; Kouf v. Walt Disney Pictures & Television,* 16 F.3d 1042, 1045 (9th Cir.1994).

▮ "For summary judgment, only the extrinsic test is important." *Kouf,* 16 F.3d at 1045. "A plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury cannot find substantial similarity without evidence on both the extrinsic and intrinsic tests." *Id.* Further, because the intrinsic test relies on the subjective judgment of the ordinary person, it must be left to the jury. *Swirsky,* 376 F.3d at 845. Thus, the Court's analysis on summary judgment is limited to the extrinsic test.

▮ Where literary works (films, screenplays, television series, etc.) are at issue, the extrinsic test is an objective evaluation of "the articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events." *Id.* In applying the test, the Court must distinguish between protectable and unprotectable material, because a party claiming infringement may not rely on expressions from unprotected elements. *Rice,* 330 F.3d at 1174. For example, general plot ideas are not protectable and cannot give rise to a copyright infringe-

---

**13.** It is important to note, however, that even had the Court accepted Sherman's opinion, it would not change the outcome. At best, Sherman's opinion merely supports a finding that it was likely that "someone" at TGA, likely Gersh, read *Karma!.* Nonetheless, for the reasons stated above, Plaintiff has not established that this "someone" was an intermediary under *Meta–Film.*

ment claim. *See Berkic*, 761 F.2d at 1293 ("General plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind."). Further, the doctrine of *scenes a faire* "holds that expressions indispensable and naturally associated with the treatment of a given idea 'are treated like ideas and are therefore not protected by copyright.'" *Rice*, 330 F.3d at 1175 (quoting *Apple Comp. Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1444 (9th Cir.1994)). Accordingly, the extrinsic test examines "not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Berkic*, 761 F.2d at 1293.

Summary judgment on the issue of substantial similarity is appropriate "if no reasonable juror could find substantial similarity of ideas and expression." *Funky Films*, 462 F.3d at 1077 (quoting *Kouf*, 16 F.3d at 1045). Although summary judgment is not highly favored on the issue of substantial similarity in copyright cases, "substantial similarity may often be decided as a matter of law." *Id.* (quoting *Sid & Marty Krofft Television Prods. Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir.1977)). Indeed, the Ninth Circuit "ha[s] frequently affirmed summary judgment on the issue of substantial similarity." *Shaw v. Lindheim*, 919 F.2d 1353, 1355 (9th Cir.1990).

As discussed below, the Court concludes that no reasonable jury could find *Earl* and *Karma!* to be substantially similar.

#### i. Evidence Considered

The Court engaged in detailed review of the works at issue. Specifically, the Court read the *Karma!* screenplay by Mark Gable (Docket No. 21–6), watched the pilot episode for *Earl*, and watched all 24 episodes of the first season of *Earl*. The Court also watched 5 select episodes of the second season of *Earl*. Notably, Plaintiff

(and Plaintiff's expert) only compared *Karma!* with episodes from the first and second seasons of *Earl* when analyzing the alleged similarities between the works. Thus, the Court focused on those episodes of *Earl* which Plaintiff contends demonstrate a substantial similarity with *Karma!* *See Sony Pictures Entertainment, Inc. v. Fireworks Entertainment Group, Inc.*, 156 F.Supp.2d 1148, 1157 (C.D.Cal.2001) ("It is the copyright plaintiff's burden to identify the elements for [the extrinsic test] comparison.") The Court also considered a chart that Plaintiff created, which presents a side-by-side comparison of those portions of the two works that Plaintiff contends are similar. (Gable Decl., Exh. G [hereinafter "Plaintiff's Comparison Chart"]; Suppl. Gable Decl., Exh. A.)

#### a. Expert Testimony

In addition to the works themselves, Plaintiff relies on the expert report of David Nimmer ("Nimmer") to establish substantial similarity. Nimmer's expert report contains approximately 20 paragraphs of comparisons between the objective elements of *Karma!* and *Earl*. The report also contains a lengthy legal analysis of Ninth Circuit case law, and concludes by responding to the expert report offered by Defendants' expert, Jeff Rovin. Nimmer ultimately opines that: "Based on my review of Ninth Circuit case law, the facts at bar present a situation in which substantial similarity presents a triable issue of fact—a reasonable factfinder could conclude, based on all the circumstances, that defendants actionably copied from plaintiff's screenplay." (Nimmer Decl. ¶ 27.)

Defendants object to the testimony offered by Nimmer on several grounds. First, Defendants argue that Nimmer, while certainly an expert in the field of copyright law, is not qualified to offer a literary analysis in this case. Further,

Defendants object that Nimmer's report contains inadmissible legal conclusions, and challenge Nimmer's methodology.

 The Court agrees that Nimmer's expert report is not admissible. Pursuant to Federal Rule of Evidence 702, a witness may offer an expert opinion only if he or she draws on some special "knowledge, skill, experience, training or education to formulate that opinion." Fed. R.Evid. 702. However, "the opinion must be an expert opinion (that is, an *opinion informed by the witness' expertise*) rather than simply an opinion broached by a purported expert." *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723 (7th Cir.1999) (citing to *United States v. Benson*, 941 F.2d 598, 604 (7th Cir.1991)) (emphasis added). Thus, to determine whether a proposed expert is qualified, the court must examine whether the witness's qualifying training, experience, or specialized knowledge is sufficiently related to the subject matter upon which the witness offers an opinion. *See United States v. Chang*, 207 F.3d 1169, 1172 (9th Cir.2000) ("To qualify as an expert, a witness must have knowledge, skill, experience, training or education, relevant to such evidence or fact in issue."); *In re Canvas Specialty Inc.*, 261 B.R. 12, 19 (C.D.Cal.2001) ("It is not enough that the proposed expert have expertise in an area of knowledge. The expertise must be relevant to the determination of the facts in issue."); *Jones*, 188 F.3d at 723 ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony."). The proponent of the expert bears the burden of demonstrating that the expert is qualified. *United States v. 87.98 Acres of Land More or Less in the County of Merced*, 530 F.3d 899, 904–05 (9th Cir. 2008); *Baker v. Urban Outfitters, Inc.*, 254 F.Supp.2d 346, 353 (S.D.N.Y.2003).

Here, Plaintiff has not demonstrated that Nimmer is qualified to render an expert opinion on the issue of substantial similarity between two literary works. Nimmer's experience, training, and education establish that Nimmer undoubtedly is an expert in the field of copyright law. He is a graduate of Yale Law School, and a partner at the Los Angeles-based firm of Irell & Manella. He specializes in and teaches copyright law and is the current author of the preeminent copyright treatise *Nimmer on Copyright*, which is often cited by appellate courts, including the Supreme Court. Over the past three decades, Nimmer has published numerous books and dozens of articles on copyright law, spoken at many copyright law conferences, and taught seminars to federal judges on the issue of substantial similarity in copyright law. Given this extensive background, there can be no question that Nimmer is well-qualified to perform a *legal analysis* regarding copyright claims. However, as discussed below, an expert cannot offer his legal opinion as to whether a triable issue of fact exists regarding copyright infringement; such an analysis is the exclusive province of the Court.

Instead, the relevant issue on summary judgment, and indeed the subject matter upon which Nimmer seeks to opine, is whether there is substantial similarity in the objective elements of theme, plot, dialogue, characters, sequence of events, mood, pace, and setting between *Karma!* and *Earl*. In short, Nimmer was tasked with performing a literary analysis of two fiction works. However, Nimmer offers little explanation as to how his legal expertise qualifies him to compare a screenplay and a television series on the eight criteria mentioned. Notably absent from Nimmer's report and declarations is any indication that Nimmer has experience, knowledge, training, or education in the literary field—for example, there is no evidence

that Nimmer has ever worked as a film critic, a publisher, an English professor, an editor or director, that Nimmer writes fiction works, or even that Nimmer is an avid movie buff or television-watcher. While the Court recognizes that the task of comparing two fiction works is not highly technical, and indeed requires no specific training, to offer an *expert literary analysis* there must be some indication that Nimmer has, in one capacity or another, watched, read, written, compared and/or analyzed literary works.[14] *See e.g., Stewart v. Wachowski*, 574 F.Supp.2d 1074, 1106 n. 130 (C.D.Cal.2005) (expert was an English professor who had previously testified in several matters regarding substantial similarity); *West v. Perry*, No. 2:07CV200, 2009 WL 2225569, at *5 (E.D.Tex.2009) (among other qualifications, expert had a film degree, was an accomplished screenwriter, and had worked as a screen credit arbitrator for the Writer's Guild of America); *A Slice of Pie Productions, LLC v. Wayans Bros. Entertainment*, 487 F.Supp.2d 33, 41 (D.Conn.2007) (expert had extensive experience teaching, evaluating, studying, and writing about screen writing). No such evidence exists here.

Further, Nimmer's prior experience as an expert witness or consultant, with perhaps one or two exceptions, is not relevant to the literary analysis offered in this case. Nimmer lists several cases in which he previously offered expert testimony regarding the substantial similarity of works such as technical drawings, architectural plans, bingo cards, instructions for the use of pesticides, and computer software. (Supp. Nimmer Decl. ¶¶ 7–10.) Nimmer does not explain the specific analysis he performed; however, his assignments in those cases did not involve fiction works such as television shows, plays, movies, or books. Thus, this prior experience does not inform the literary analysis offered here.[15] There are two instances in which Nimmer may have performed a similar analysis as that offered here, although given the vague descriptions of these assignments, it is difficult to know for certain. First, Nimmer declares that he assisted a publisher in overturning an injunction in a copyright case involving a comparison be-

14. The Court is using the term "literary works" loosely to relate to the type of works at issue in this case—a screen play and a television series—and their analogs such as motion pictures and books. In other words, the Court uses the term to refer to those works in which substantial similarity analysis would be based on the elements of theme, plot, characters, sequence of events, dialogue, mood, setting, and pace. The Court recognizes that, under the Copyright Act, a movie or television series would fall into the category of an audiovisual work, whereas a book or screenplay would be categorized as a literary work. 17 U.S.C. § 102(a)(1), (a)(6).

15. Nimmer argues in his report that he has "long championed the view that the same tools to address substantial similarity in traditional domains, such as plays, should be deployed to perform the comparable substantial similarity analysis in the newer domain of computer software." (Supp. Nimmer Decl. ¶ 10 [citing to 4 Nimmer on Copyright § 13.03[F]].) Nimmer may very well be correct that a general approach in which the court first excludes non-protectable elements (such as stock elements or elements dictated by function or genre) and then analyzes the remaining objective elements of a work is a useful framework for both traditional works as well as computer software. However, this does not change the fact that the specific eight criteria used to analyze the objective elements of traditional works, like plays—plot, theme, characters, etc.—are simply not applicable to works such as computer software or technical drawings. Thus, to the extent that Nimmer is suggesting that a witness qualified to compare the objective components of two computer software programs for substantial similarity would, by virtue of that expertise, be qualified to analyze the similarities between a novel and film, the Court flatly disagrees.

tween Margaret Mitchell's *Gone with the Wind* and Alice Randall's *The Wind Done Gone*. But Nimmer fails to describe the issue that he was asked to analyze or the opinion he ultimately rendered in that case.[16] (*Id.* ¶ 11.) Nimmer also notes one assignment, in *Time Warner Entertainment Co. v. Continental Casualty Co.*, Case No. 02–01885 R (C.D.Cal.), where he was asked to compare a revised screenplay with the motion picture *Contact* and concluded that the unlicensed, protectable expression from the screenplay that was used in the film gave rise to a valid copyright claim. (*Id.* ¶ 6.) While this prior experience appears relevant, the fact that Nimmer testified as an expert once before in a case involving literary works is not a sufficient basis, without more, to accept his testimony here.[17]

In sum, Nimmer's specialized knowledge of copyright law and his legal expertise does not qualify him as a literary expert. See, e.g., *Gen. Battery Corp. v. Gould, Inc.*, 545 F.Supp. 731, 750 n. 24, 759 n. 30 (D.Delaware 1982) (patent lawyer, although knowledgeable about the patent office procedure, was not qualified to give an expert opinion on infringement where he was not skilled in the relevant art of the patented products); *United States v. Chang*, 207 F.3d 1169, 1172–73 (9th Cir. 2000) (witness who was "extremely qualified" in international finance was not qualified to render an opinion on the authenticity of a securities certificate where he had no training in identification of counterfeit securities); *In re Canvas Specialty, Inc.*, 261 B.R. 12 (C.D.Cal.2001) (witness not

qualified where witness was an architect but had not demonstrated how his training as an architect gave him the necessary expertise to determine whether metal cabanas met contract requirements or had structural defects). As such, Nimmer's opinions as to the points of similarity between *Karma!* and *Earl* are not admissible.

█ Finally, the remaining portion of Nimmer's report, in which Nimmer instructs the Court as to Ninth Circuit law and concludes that "a triable issue of fact exists" is not admissible. (Nimmer Decl. ¶¶ 26–38.) It is well established that, "an expert may not state his or her opinion as to legal standards, nor may he or she state legal conclusions drawn by applying the law to the facts." 33A Fed. Proc., L. Ed. § 80:283 (West 2009); *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir.1992); *Nationwide Transport Finance v. Cass Information Systems, Inc.*, 523 F.3d 1051, 1059–60 (9th Cir.2008); *McHugh v. United Serv. Auto. Ass'n*, 164 F.3d 451, 454 (9th Cir.1999); *see also*, Joseph M. McLaughlin, et al., Weinstein's Federal Evidence § 702.03[3] (2d ed.2009). Such opinions invade on the province of the judge. *See Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C.Cir.1997). Here, portions of Nimmer's report read much like a third legal brief. Nimmer analyzes five Ninth Circuit copyright cases, "weigh[s] [the two works] against [his] comprehensive review of Ninth Circuit jurisprudence," and concludes that a triable issue of fact exists. (Nimmer Decl. ¶ 38.)

---

**16.** The Court is familiar with the Eleventh Circuit's opinion overturning the injunction in *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257 (11th Cir.2001), and notes that there were critical copyright issues in *Suntrust Bank* that are not relevant to the present case—for example, whether the allegedly infringing work was entitled to fair use protection as a parody.

**17.** Having reviewed the docket in *Time Warner Entertainment Co.*, of which the Court takes judicial notice, it appears that the opposing party did not object to Nimmer's qualifications as an expert; thus, the issue of Nimmer's literary expertise (or lack thereof) was not addressed.

This opinion constitutes a legal conclusion and is not admissible.

■ For these reasons, the Court excludes Nimmer's expert report. Nonetheless, even had the Court considered the report, it would not have altered the substantial similarity analysis below. To the extent that Nimmer's report offers objective points of comparison between the two works, most (if not all) of those comparisons were also noted in Plaintiff's Comparison Chart, which the Court has considered. Further, although expert testimony comparing literary works is generally accepted in the Ninth Circuit, the Court finds that such testimony is only marginally helpful in cases such as this, where the works are targeted at a general audience and deal with subject matter readily understandable by ordinary persons.[18] Thus, the Court's analysis is largely based on the Court's own extensive review of the works. Finally, contrary to Plaintiff's arguments otherwise,[19] the mere existence of dueling

18. Expert testimony is far less critical in a case like this than it is in a case where specialized knowledge is required to dissect the objective components of the copyrighted work. *See, e.g., Brown Bag Software,* 960 F.2d at 1473–74 (relying on expert testimony to identify the objective points of comparison among different computer software programs); *Swirsky v. Carey,* 376 F.3d 841, 847–48 (9th Cir.2004) (relying on expert testimony comparing the objective elements—pitch, melodies, baselines, tempo, chords, structure, and harmonic rhythm—of musical works); *Chiate v. Morris,* Case No. 90–55428, 1992 WL 197591, *5 (9th Cir., Aug. 17, 1992) (finding that expert testimony by a musicologist is crucial to proving objective similarity of songs); *see also* Dowd, COPYRIGHT LITIGATION HANDBOOK § 15:27 (2d ed.2009) (noting that expert testimony is often helpful in cases involving computer programs and functional objects, but will "seldom be necessary" to determine substantial similarity between literary works). Indeed, several other courts have cast doubt on whether expert testimony regarding substantial similarity is *ever* helpful in a case involving the comparison of two literary works. *See e.g., Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 123 (2d Cir.1930); *Stromback v. New Line Cinema,* 384 F.3d 283, 295 (6th Cir.2004); *Kindergartners Count Inc. v. Demoulin,* 249 F.Supp.2d 1214, 1232 (D.Kan.2003). As stated above, the Ninth Circuit generally takes a broader view, and often finds that expert testimony is appropriate regarding the objective substantial similarity of literary works. *See Olson,* 855 F.2d at 1449; *Sid & Marty Krofft Television Productions, Inc.,* 562 F.2d 1157, 1164 (9th Cir. 1977). Nonetheless, several Ninth Circuit cases have recognized the limitations of expert testimony in this area. *See Rice v. Fox Broadcasting Co.,* 330 F.3d 1170, 1179 (9th Cir.2003) (upholding the district court's decision to disregard the parties' expert reports where the court engaged in an extensive analysis of the alleged similarities in expressive elements of the works and "neither expert opinion [was] very relevant to the conclusions drawn by the court"); *Olson,* 855 F.2d at 1450–51 (holding that the district court's decision to discount expert testimony was appropriate where the expert deemphasized dissimilarities between the works and compared *scenes a faire*); *Shaw v. Lindheim,* 919 F.2d 1353, 1357 (9th Cir.1990) (viewing the expert report with caution where it focused on random similarities in the works).

19. At the summary judgment hearing, Plaintiff's counsel argued that *Swirsky v. Carey,* 376 F.3d 841 (9th Cir.2004), held that if experts from both parties disagree on the issue of substantial similarity, the case should be submitted to the jury. This is a misreading of *Swirsky.* In *Swirsky,* the Ninth Circuit was discussing the general summary judgment standard, not the testimony of experts, when it noted that if plaintiff "presented indicia of a sufficient disagreement concerning the substantial similarity of [the] two works, then the case must be submitted to a trier of fact." *Id.* at 844. *Swirsky* was quoting *Brown Bag Software v. Symantec Corp.,* 960 F.2d 1465, 1472 (9th Cir.1992), which in turn quoted from *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), a seminal Supreme Court case setting out the standard for ruling on summary judgment motions generally. Thus, when read in context, the portion of *Swirsky* quoted above simply restates the standard for evaluating a summary judgment motion—that is, if the evidence presented indicates that reasonable minds could differ as to which party should

expert reports does not necessarily create a triable issue of fact. Numerous cases have found in favor of defendants on the issue of substantial similarity despite the existence of expert testimony offered by plaintiffs. *See, e.g., Rice,* 330 F.3d at 1180 (affirming summary judgment for defendants where the parties' each submitted expert reports); *Olson v. Nat'l Broadcasting Co., Inc.,* 855 F.2d 1446, 1451, 1453 (9th Cir.1988) (affirming the district court's grant of judgment notwithstanding the verdict after Plaintiff offered expert testimony at trial that sought to demonstrate similarity between the works); *Brown Bag Software v. Symantec Corp.,* 960 F.2d 1465 (9th Cir.1992) (affirming summary judgment for defendants where plaintiff presented expert testimony on the issue of substantial similarity).

Defendants also submitted an expert report in this case. Defendants' expert, Jeff Rovin, has spent his entire adult life as a professional writer. (Rovin Decl. ¶ 3, pg. 5, Appx. 4.) He has authored 124 books, both fiction and non-fiction, including several books analyzing films and television series—e.g., *The Films of Charleston Heston, The Fabulous Fantasy Films, The Great Television Series.* (*Id.,* Appx. 4.) Among other relevant experience, Rovin was a writer on two television series and a consultant on three others, provided DVD commentary on three recent films, and has written monthly film columns in several magazines for years. (*Id.*) His magazine publications include *Fascinating Facts from the Bible* (1995–2001) and *The Weekly Worlds News* (2005–2007) which regularly published stories about angels, fate, and other aspects of religious phenomenon. Rovin's expert report establishes that he has extensive knowledge of films and books related to karma, fate, and related topics. Based on this experience, the Court concludes that Rovin has significant knowledge and experience in the literary field to render an opinion on whether the expressive elements of *Karma!* and *Earl* are substantially similar. Indeed, Plaintiff has not challenged Rovin's qualifications as an expert.

 While Rovin's expert report is admissible, the Court did not rely on it to conclude that no reasonable jury could find the works to be substantially similar. Many of the dissimilarities between *Karma!* and *Earl* that Rovin addresses are apparent from a review of the works themselves, and do not require a trained literary eye. Thus, as stated above, the Court relied primarily on its own review of the works in coming to the conclusion that no triable issue of fact exists as to substantial similarity. Furthermore, while expert testimony can be useful when examining whether the alleged similarities between two works constitute *scenes-a-faire, see* GOLDSTEIN ON COPYRIGHT § 16.4.2 (3d ed. 2006), the Court notes that comparisons to prior art are only helpful to the extent that they are genre-specific. That is, an unprotectable *scenes-a-faire* is an element of a story that is standard in a particular genre or that derives from the basic plot idea—e.g., a saloon shoot-out might be a standard element in an action film set in the old west. *Rice,* 330 F.3d at 1175. Here, it is not helpful to simply point out that certain past works also included a particular element; rather, to demonstrate that the element is not protectable, it must be shown that such an element is standard or

prevail, the case must go to the jury. However, where no reasonable jury could conclude that the two works are substantially similar, summary judgment on the issue of substantial similarity is appropriate, notwithstanding du-

eling expert reports. *See Flynn v. Surnow,* No. CV 02–9058–JFW (PLAx), 2003 WL 23411877, *4 (C.D.Cal., Dec. 9, 2003) (citing to *Narell v. Freeman,* 872 F.2d 907, 910 (9th Cir.1989)).

indispensable in literary works centered around the themes of karma or redemption. *See Fleener v. Trinity Broadcasting Network,* 203 F.Supp.2d 1142, 1150–51 (C.D.Cal.2001). Thus, to the extent that Rovin's comparisons to prior art are not genre-or-theme-specific, the Court has discounted those instances in its analysis.

With those considerations in mind, the Court turns to the objective analysis of *Karma!* and *Earl.*

### ii. Objective Analysis

#### a. Theme

At an abstract level, both *Karma!* and *Earl* involve the central themes of karma and redemption. The ideas of righting past wrongs and good things happening to good people are general storylines that have been around for thousands of years. These ideas, standing alone, are not protectable. *See Olson v. Nat'l Broadcasting Co.,* 855 F.2d 1446, 1450 (9th Cir. 1988) (the general idea of a group action-adventure series in which Vietnam veterans do good deeds and are portrayed in a positive light is not protectable); *Berkic v. Crichton,* 761 F.2d 1289, 1293 (9th Cir. 1985) (finding that the basic plot idea of a young professional who courageously investigates and exposes a criminal organization that kills persons to sell their vital organs is not protectable).[20]

Moreover, the manner in which the themes of karma and redemption are expressed in each work is different. In Plaintiff's screenplay, the notion of karma has an obvious religious underpinning. At the beginning of the screenplay, Frankie's brother, who is a priest, tells Frankie: "you look like you've been out in the desert for forty days and forty nights! And the devils [sic] got the best of you." (Rubin

Decl., Exh. D, at 85.) Frankie is then visited by an angel, who meets him at the Cemetery of the Blessed Virgin. The angel has divine powers; he stops the rain from falling and brings dying flowers back to life. The angel also can fly, and transforms himself into other beings, such as the blind homeless person and a white dove. The angel tells Frankie that he must take certain steps to save the soul of his unborn son, and when Frankie attempts to bargain with the angel, the angel tells him "it's not up to me anyway." (*Id.* at 91.) Later in the screenplay, Frankie asks the angel why he has chosen to guide Frankie, and the angel responds, "God believes he can resurrect all of his sons who have fallen." (*Id.* at 125.) As the screenplay progresses, Frankie turns his life around and begins to have faith in the power of God. For example, at the pivotal moment in the screenplay where Frankie goes undercover and successfully foils a major drug deal, his former Lieutenant tells Frankie that he did "real good." Frankie responds, "Yea, by the good grace of *God.*" (*Id.* at 179.) (emphasis in the original). When the Lieutenant incredulously respond, "... God? As I recall, you never really believed in that sort of thing," Frankie responds, "Yea, well you could say I was *baptized* in that river." (*Id.*) (emphasis in the original). At the end of the screenplay, when Frankie dies, he turns into an angel. Frankie asks Angel Man about his wings, and Angel Man tells him, "You fell from grace, but you've earned them back." (*Id.* at 186.) The screenplay concludes with Frankie, now an angel, watching over Tori Ann. (*Id.* at 187–88).

In sum, the religious overtone in *Karma!* is seen throughout the screenplay. Frankie's fall is "a fall from grace," and it

---

**20.** While the Court has rejected the report of Plaintiff's expert, David Nimmer, the Court notes in passing that Nimmer agreed that the theme of turning bad karma into good karma and the concept of making amends were not protectable. (Supp. Rubin Decl., Exh. 1 [Nimmer Depo. at 97:24–98:21, 120:5–7].)

is through his good works and his eventual acceptance of God that Frankie is redeemed. Frankie lives on after death, as an angel who watches over those he loves.

In *Earl*, karma is not a religious concept, nor does Earl go through any type of faith-based transformation. Earl learns about Karma from Carson Daly, a Hollywood celebrity, during a televised interview. Daly is not a celestial being, he does not direct Earl to take any actions; indeed, he is not even speaking specifically to Earl. Daly never again appears in *Earl*, and does not "guide" or watch over Earl. Instead, Earl decides on his own to adopt Daly's karmic philosophy. In *Earl*, like in *Karma!*, the notion of karma is personified—Earl talks to "karma" in several episodes as though he were speaking to a person and implores karma to help him out of certain situations. However, the force of karma is not embodied in a celestial being, nor does it have a religious undertone. Unlike in *Karma!*, Earl is not saved "by the grace of God," he does not adopt any religious convictions, and he does not experience a religious rebirth.

Thus, while both works share similar unprotectable themes, the expression of those themes is markedly different.

#### b. Plot

The story of redemption naturally begins with someone who needs to be redeemed, and ends with that same person doing good acts and making up for past wrongs. In this manner, both Earl and Frankie can quite easily be compared to Scrooge in Charles Dickens's *A Christmas Carol*. All three characters start as bad people, have a realization that their actions affect their future, and subsequently decide to lead better lives by making up for past wrongs. Again, this basic plot idea is not copyrightable. *Berkic*, 761 F.2d at 1293.

Beyond these general plot ideas, and the fact that in both works the main character wins the lottery (discussed below), there is little in common between *Earl* and *Karma!* Earl is a small town low-life who steals, lies and bullies people on a regular basis. Although Frankie also steals once he is out of prison, Frankie is not just a low-life, but a disgraced detective who took bribes from criminals and associates with dangerous drug dealers.

Further, the incarnation of each character's bad karma is markedly different. In *Earl*, karma retaliates for Earl's bad acts in random ways. For instance, when Earl undeservedly wins the lottery, he is hit by a car. Earl is motivated to do good deeds primarily to avoid karma's retribution against him. In *Karma!*, on the other hand, Angel Man tells Frankie that his bad karma will affect the life of his unborn son. Thus, Frankie is motivated to improve his own life, as well of the lives of others, including his son.

Each character has a vastly different karmic realization. Earl begins to believe in karma when, upon having a good thing happen to him, winning the lottery, he is immediately hit by a car. The accident not only leaves Earl in the hospital with nearly his whole body in a cast, but also makes Earl lose the lottery ticket. Upon hearing Carson Daly's speech about karma, Earl decides that he is being punished for all of his bad deeds and decides to right his life. In contrast, Frankie's karmic realization revolves completely around Angel Man. Angel Man shows Frankie an image of Frankie's unborn son, and convinces Frankie that he must amend his past wrongs and straighten out his life in order to save the soul of his unborn child. As such, Frankie's revelation is starkly different from that of Earl.

After these markedly different realizations, both characters turn to making amends for their past deeds. Earl creates a list of everything he has ever done

wrong, and begins to work at crossing each and every mistake off the list. Just by starting, Earl's lottery ticket is carried back to him by the wind. Thus, Earl becomes convinced of karma's power. In each episode, Earl aims to amend a specific past wrong with the goal of crossing it off his list. In contrast, Frankie never creates any list of the bad things he done.[21] Instead, Frankie seemingly amends his wrongs as opportunities arise—for example, when Frankie sees a man drop his wallet, he returns it. Frankie's efforts to turn his life around culminate in his valiant attempt to clear his name as a police officer by going undercover and busting a large drug deal. When Frankie is successful, the newspaper runs a front-page story heralding Frankie's transformation with the headline: "X-bad cop, makes good." (Rubin Decl., Exh. D, pg. 183.) There is no counterpart to this plot point in *Earl*. Instead, Earl's journey toward redemption is seemingly never-ending; although he makes up for a specific wrong in each episode, he often makes mistakes and has to add new items to the list.

Plaintiff stresses that both works have the main character win a lottery ticket, and both characters use the lottery winnings to remedy past misdeeds. However, the lottery winnings are different amounts of money and play different roles in each work. Most notably, Earl's winning the lottery *leads* to Earl's karmic realization. In winning the lottery, Earl enthusiastically celebrates his winnings and gets hit by a car. When he loses the lottery ticket in the accident, this triggers Earl's realization that bad things happen to him because he is a bad person. In short, it is the *loss of the lottery ticket* that sets Earl's redemption in motion. Once Earl begins do good deeds, the lottery ticket immediately returns to him and convinces Earl of karma's power. Further, Earl's lottery winnings are only $100,000, not enough to change Earl's life significantly, but enough to enable Earl to spend his days crossing wrongs of his list, instead of getting a job.

In *Karma!*, Frankie has his karmic realization before he comes into any money. In fact, it is Angel Man's *promise of money in the future* that motivates Frankie to do good deeds. Frankie initially wins $300 from a scratcher and uses that money to pay the blind man, buy candy for teenagers, and pay back-owed rent. Even after the initial win, however, Frankie asks Angel Man if he is going to come into wealth. Thus, Frankie is always looking forward to the reward of money, which entices him to stay on the straight and narrow. Unlike Earl, Frankie does not win any substantial amount of money until the end of the screenplay, when he wins two million dollars. Further, while Earl uses his lottery winnings to redeem his own past wrongs, Frankie uses the bulk of his winnings—a million dollars—to rebuild an orphanage that has no relationship to Frankie's past misdeeds.

---

**21.** Plaintiff argues that, like Earl, Frankie does have a list. Plaintiff refers to the "list" of the three things Angel Man told Frankie to do—(1) make amends for past wrongs; (2) clean up your life; and (3) use the money you come into wisely. This is not a point of similarity. First, Angel Man does not give Frankie a physical list. In *Earl*, the physical list—i.e. the piece of paper that Earl wrote his misdeeds on—is central to the show. Other characters refer to it, Earl is constantly taking the list out of his pocket to add or delete items, and it is the barometer of how well Earl is doing in his life. Thus, the fact that there is no physical list in *Karma!* is an important difference. Further, even if Angel Man's three-part agenda could be characterized as a "list", it is not a list of wrongs for which Frankie needs to amend. Indeed, only one item on Angel Man's "list" relates to righting past wrongs, and it does not delineate the specific wrongs Frankie must correct.

Beyond the karmic arc and the lottery tickets, Plaintiff lists roughly a dozen other plot points that Plaintiff contends make the works substantially similar. Much of this list is made up of random similarities that have no qualitative significance to the works—for example, Plaintiff argues that in both works there is an "old oriental bum," and that in both works, the main character expresses appreciation for his brother. The Ninth Circuit has repeatedly held that "such lists of similarities . . . are inherently subjective and unreliable," and a court should be "particularly cautious where, as here, the list emphasizes random similarities scattered throughout the works." *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir.1984) (summary judgment granted where there was no substantial similarity in the sequence of events, mood, dialogue or characters, and plot similarities existed "only at the general level for which plaintiff cannot claim copyright protection"); *see also, Olson*, 855 F.2d at 1450 n. 3; *Kouf*, 16 F.3d at 1046 *Shaw*, 919 F.2d at 1362. These minor elements, scattered throughout the works, are not probative of similarity.

Other instances that Plaintiff relies on simply are not similar. For example, Plaintiff notes that in *Karma!*, Tori Ann wants to have sex with Frankie, but he tells her she will regret it, while in *Earl*, Earl and Joy have sex and Earl states that it was a big mistake. In the abstract, these events sound similar, but in context, the differences between these two scenes are overwhelming. In *Karma!*, Frankie tells Tori Ann that they should not have sex because Tori Ann is high on drugs. Up until that point in the story, Frankie and Tori Ann have had a completely plutonic relationship. Frankie wants to sleep with Tori Ann, but not when Tori Ann is out of control and not thinking clearly. Thus, Frankie resists her in that moment, making it all the more special when the two make love later in the screenplay. In

*Earl*, Earl and Joy were previously married. After their divorce, Earl gives into temptation and has sex with Joy while helping her plan her wedding to Crabman. Earl feels guilty for betraying his friend Crabman, and confesses to him, telling Crabman that it was a big mistake. Crabman forgives Earl and Joy and goes through with the wedding. These storylines are not similar: In *Karma!*, Frankie does the right thing, resists temptation, and later falls in deeply in love with Tori Ann, whereas in *Earl*, Earl does the wrong thing, gives into temptation and betrays a friend, later having to apologize.

As another example, Plaintiff points out that both Earl and Frankie return a man's wallet as an act of good karma. But the idea of a low-life thief stealing a wallet is hardly protectable, and the concrete expression of making amends for the theft is different in each work. Earl finds the specific person from whom he stole the wallet, whereas when Frankie sees that he has the opportunity to steal another man's wallet, he decides to do the right thing and return the wallet to the owner. Thus, Earl is making amends against the original person he hurt, whereas Frankie is simply deciding not to steal again.

Finally, Plaintiff's list focuses on several unprotectable stock elements or *scenes-a-faire* that are scattered throughout the works. For example, Plaintiff notes that both Earl and Frankie spend time in prison, and after turning their lives around, both characters repay money to those from whom they stole, and at some point, both men get a job. These storylines are driven by the basic plot idea of turning one's life around. The concept of a bad person spending time in prison, and then trying to clean up their act by making restitution and getting a job are unprotectable *scenes-a-faire* in a story about redemption. *See, e.g., Walker v. Time Life Films, Inc.*, 784

F.2d 44, 50 (2d Cir.1986) (In two works depicting the experience of policemen in New York's crime-laden 41st Precinct, scenes of a policeman murdered at close range, cockfights, drunks, stripped cars, prostitute, rats, unsuccessful foot chases of fleeing criminals, and demoralized officers were stock scenes commonly linked to the genre of the works); *Berkic*, 761 F.2d at 1293 (holding that no protection may be afforded to "situations and incidents which flow naturally from a basic plot premise"). Similarly, Plaintiff points out that in both works, a piece of paper floats back to the main character starting the idea of karma. In *Karma!*, Frankie throws a picture of an angel into the wind, and it mysteriously comes back to him. Similarly, the winning lottery ticket returns to Earl carried by the wind. However, the visual effect of a piece of paper magically floating back to someone is not a protectable expression. The effect is commonly used in works that involve themes of serendipity and fate.[22]

Although there are some general similarities between the works, the similarities pale in comparison to the significant differences between the works. In this way, the present case is similar to *Funky Films, Inc. v. Time Warner Entertainment Co., L.P.*, 462 F.3d 1072 (9th Cir.2006). In *Funky Films*, the plaintiff alleged that defendants' television series infringed upon plaintiff's screenplay. Both works depicted family-run funeral homes where the father died leaving the family's two sons to run the funeral home. *Id.* at 1077. Both works included the return of the prodigal son, a competitive bid by a rival business that does not succeed, and one son changing his religious affiliation to get

business. *Id.* The Ninth Circuit found that "[a]t first blush, these apparent similarities in plot appear significant; however, an actual reading of the two works reveals greater, more significant differences and few real similarities at the levels of plot, characters, themes, mood pace, dialogue, or sequence of events." *Id.* at 1078. The court noted that events in both works that appeared similar were, in context, qualitatively different—e.g., in plaintiff's work, the father's death sparked a series of murders, whereas the father's death in defendants' work did not—and that while both works explored the same themes, they did so in very different ways. *Id.* at 1078–80. The Ninth Circuit concluded that:

> At a very high level of generality, both works share certain plot similarities: the family-run funeral home, the father's death, and the return of the 'prodigal son,' who assists his brother in maintaining the family business. But general plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind. Beyond that, the stories do not share any detailed sequence of events.

*Id.* at 1081 (internal citations and quotation marks omitted). Thus, the Court affirmed summary judgment in favor of defendants on the issue of substantial similarity. *Id.* at 1081; *see also Walker v. Time Life Films, Inc.*, 784 F.2d 44, 49–50 (2d Cir.1986) (finding that "at the most general level, the movie and the book tell the same story"—that of policemen battling the hostile environment of New York's 41st Precinct—however, "dif-

---

**22.** These two scenes are also contextually dissimilar. In *Karma!*, Frankie is trying to get rid of the picture of the angel. He first tries to burn it, and then throws it toward a river, but the wind immediately carries it back to him. This event starts Frankie's karmic realization. In *Earl*, Earl loses a $100,000 lottery ticket— something he desperately would want to hold on to, not get rid of—when he is struck by a car. It is not until several scenes later, when Earl has already had his karmic epiphany and has started his journey toward redemption, that the wind carries the ticket back to him.

ferences in plot and structure far outweigh this general likeness.").

As in *Funky Films*, both *Karma!* and *Earl!* share the basic plot of a low-life embracing karma, winning the lottery, and straightening out his life. While the overarching theme of each story is similar, the concrete expression of how karma is portrayed, the characters' karmic realizations, the efforts taken to redeem past wrongs, and the end results are wholly dissimilar. Notably, many of the most significant elements of *Karma!'s* plot do not have any counterpart in *Earl*—for example, the guiding role of Angel Man, the unborn child who stands to inherit Frankie's karma, the idea of a fallen cop getting back his integrity and "clearing his name" through undercover police work, the drug dealer antagonist, the love story with Toni Ann and her decision to turn her life around, and most significantly, Frankie's death and subsequent transformation into an angel. Moreover, as discussed below, the sequence of events in the two works bears little resemblance. As such, no reasonable jury could find that the plots of the two works is substantially similar.

Plaintiff nonetheless urges the Court to adopt the analysis in *Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir.2002). In *Metcalf*, the Ninth Circuit held that although individual elements of a work may not be protectable, "[t]he particular sequence in which an author strings a *significant number of unprotectable elements* can itself be a protectable element." 294 F.3d at 1074 (emphasis added). In *Metcalf*, however, the sequence of unprotectable elements went far beyond the basic plot. The Ninth Circuit found the similarities between the works "striking". *Id.* at 1073. The Ninth Circuit noted:

> [Both works] are set in overburdened county hospitals in inner-city Los Angeles with mostly black staffs. Both deal with issues of poverty, race relations and urban blight. The works' main characters are both young, good-looking, muscular black surgeons who grew up in the neighborhood where the hospital is located. Both surgeons struggle to choose between the financial benefits of private practice and the emotional rewards of working in the inner city. Both are romantically involved with young professional women when they arrive at the hospital, but develop strong attractions to hospital administrators. Both new relationships flourish and culminate in a kiss, but are later strained when the administrator observe a display of physical intimacy between the main character and his original love interest. Both administrators are in their thirties, were once married but are now single, without children and devoted to their careers and to the hospital. In both works, the hospital's bid for reaccreditation is vehemently opposed by a Hispanic politician.

*Id.* at 1073–74. In sum, the works had "the same setting in the same location and city ... dealt with identical issues, had similar looking characters in identical professions, facing identical challenges" and had an "identical" sequence of events. *Identity Arts v. Best Buy Enterprise Servs.*, No., 05–4656 PJH, 2007 WL 1149155, at *27 (N.D.Cal., Apr. 18, 2007) (summarizing the facts in *Metcalf*). The Ninth Circuit concluded that "the similarities proffered by the [plaintiffs] are not protectable when considered individually; they are either too generic or constitute 'scenes a faire,' .... [h]owever, the presence of *so many generic similarities and the common patterns in which they arise*" allowed the plaintiff to satisfy the extrinsic test for purposes of summary judgment. *Id.* at 1074 (emphasis added).

*Metcalf* does not apply to the present case. In *Metcalf*, unlike this case, the "generic similarities" were voluminous, nearly identical, and occurred in the same

pattern. Here, in contrast, many of the elements Plaintiff points out are not similar when viewed in context, and those that do bear some commonality—e.g., lottery winnings, prison time, paying off debts—do not occur in the same sequence. Plaintiff has not pointed to any common pattern of unprotected elements in *Karma* that also appears in *Earl* in the sort of magnitude contemplated by *Metcalf. See Zella v. Scripps Co.,* 529 F.Supp.2d 1124, 1073 (C.D.Cal.2007) (noting that "many courts have been reluctant to expand [the concept of finding copyright protection for a pattern of unprotected elements in literary works] beyond the clear-cut case in *Metcalf,*" and granting summary judgment for defendants where plaintiff "cobbled together" a list of generic elements that did not form a specific pattern); *Flynn v. Surnow,* No. CV 02–9058–JFW (PLAx), 2003 WL 23411877, *9 (C.D.Cal., Dec. 9, 2003) (rejecting a *Metcalf* argument where the similarities "are randomly scattered throughout the works and have no concrete pattern ... in common"); *Identity Arts,* 2007 WL 1149155, at *28 (declining to apply *Metcalf* where the works shared only a few "striking similarities" and, broadly speaking, a similar sequence of events; "the cumulative weight" of the alleged similarities paled in comparison to that in *Metcalf*).[23]

### c. Sequence of Events

Beyond the fact that both works contain a karmic realization, followed by the main character making amends for previous bad acts, the sequence of events in *Karma!* and *Earl* are considerably different. *Karma!* starts with Frankie's arrest and imprisonment, and proceeds, with guidance of Angel Man, to Frankie's redemption, his winning of the lottery, the clearing of his name, and his eventual death. Earl, in contrast, wins the lottery before his karmic realization. After winning, Earl gets hit by a car and loses the lottery ticket, only to have it come back to him once he begins amending his past wrongs. Subsequently, each episode depicts Earl working through items on his list.

For the most part, *Karma!* proceeds chronologically. Frankie has one flashback when he wins the $300 scratcher ticket in which he sees Angel Man saying "use it wisely," and one flash-forward when Angel Man shows Frankie the future image of his unborn son. In contrast, *Earl* uses frequent flashbacks to depict the points in time when Earl committed the initial wrong.

As such, the Court concludes that the sequences of events are not similar.

### d. Characters

Both *Karma!* and *Earl* have leading male characters with flawed moral characters. There are some similarities between Earl and Frankie in that both start out as generally bad people and make attempts to turn their lives around; however, these character traits derive directly from the

---

**23.** *Metcalf* is also distinguishable because in *Metcalf* the defendants conceded access to plaintiffs' work; thus, the inverse ratio rule applied. 294 F.3d at 1075. The Ninth Circuit held that this concession "strengthened considerably" plaintiffs' case. *Id.* In *Rice v. Fox Broadcasting Co.,* 330 F.3d 1170, 1179 (9th Cir.2003), the Ninth Circuit explicitly declined to apply *Metcalf* to a case in which no concession of access was made. The court held: "[H]ere we are not presented with the same pattern of generic similarities as in *Met-* *calf.* And even more important, our decision in *Metcalf* was based on a form of inverse ratio rule analysis: the plaintiff's case was 'strengthened considerably by [defendants'] concession of access to their works'.... Here, there is no such concession of access as most of [plaintiff's] claims are based purely on speculation and inference." *Id.* at 1179 (internal citations omitted). As in *Rice,* here, there is no concession of access and the inverse ratio rule does not apply; thus, for this reason as well, *Metcalf* is not applicable.

general themes of karma and redemption, which are not protectable. Beyond those idea-driven characteristics, Earl and Frankie are not similar.

Frankie is an Italian–American and in his forties. He is a gritty character, filthy and prone to sarcasm. Before his redemption, Frankie is a serious criminal. As a cop, Frankie took bribes from a young African–American drug dealer. Frankie uses drugs, and knows several habitual drug users and dealers.

Earl, on the other hand, is a white male in his thirties, but is a redneck type of character. Although Earl is unseemly, he is upbeat and friendly. He is generally well-liked by the other characters, and is often portrayed as the leader of his rag-tag crew of his friends. Earl is a petty thief, not a serious criminal. His prior bad acts range from blundering crimes—such as robbing a bank with a squirt gun—to petty mischiefs like making fun of persons with accents and rigging a high school football game. Earl does not use drugs. Unlike Frankie, Earl does not have a religious awakening.

Plaintiff also compares Toni Ann and Joy. Toni Ann is 27 and attractive. She is a habitual drug user and dealer, and a struggling model. Tori Ann is sarcastic and tough, but has a good heart, and eventually turns her life around.

Like Tori Ann, Joy is also in her twenties, is attractive, and has a sarcastic attitude. Other those general character traits, however, the women have little in common.[24] Joy is not a habitual drug user or dealer, nor is she a struggling model. Joy is a mother of two who lives in a trailer park and runs a nail salon out of her trailer. Unlike Tori Ann, Joy is an irredeemable character. She is manipulative and selfish, and often looks out for herself at the expense of others.

The role Tori Ann and Joy play in the works and their relationships with the main characters are extremely different. In *Karma!*, Tori Ann and Frankie start off as friends and gradually build a romantic relationship. At the end of the screenplay, the two are deeply in love and are portrayed as soul mates. Tori Ann respects and looks up to Frankie, who is much older than her, and is so inspired by Frankie's decision to turn his life around that she too embarks on her own journey of redemption. Frankie tells Tori Ann that he will share his lottery winnings with her so they can build a better life together. After his death, Frankie spends his days in the afterlife looking over Tori Ann. Angel Man tells Frankie that Tori Ann will soon join them in heaven.

Joy, on the other hand, is far from Earl's soul mate. Joy and Earl got married while extremely drunk in Las Vegas. At the time they were married, Joy was already pregnant with another man's child, and soon thereafter she cheats on Earl, has a child with Crabman, and leaves Earl. Joy is a nuisance and an antagonist to Earl. Unlike Tori Ann, she is not inspired by Earl's good deeds; instead, she often works against Earl and pokes fun at his list and his efforts at redemption. Moreover, unlike in *Karma!*, where Frankie wants to share his lottery winnings with Tori Ann, Earl often takes pains to hide his lottery winnings from Joy, who is on a constant quest to steal Earl's money for herself.

Plaintiff's argument that both Tori Ann and Joy know how to use a firearm actually demonstrates the significant difference between the two characters. While it is

---

24. These character traits—young, attractive, and sarcastic—are not protectable. Indeed, "young, attractive, and sarcastic" could be used to describe half of the women appearing on television and in films today.

true that both women use a gun, Tori Ann uses the gun to try and *save Frankie's life* by shooting at Frankie's rival, James Randson. Joy, in contrast, uses the gun to *try and kill Earl* so as to inherit his lottery winnings. In sum, the roles that Tori Ann and Joy play in each work and their relationships with the main characters bear nothing in common.

The supporting cast in each work is not similar. Although both Frankie and Earl have brothers, Frankie's brother, Augustus, is an enlightened priest and a minor character in the screenplay. Earl's brother Randy, in contrast, is a prominent character who serves as Earl's dim-witted sidekick throughout the show. Unlike Augustus, Randy appears to have no religious convictions. Further, Shrimp and Crabman (a.k.a Darnell) are nothing alike. Shrimp is a crude, unintelligent "punk kid" who plays the partner-in-crime to a local drug dealer. In contrast, Crabman is a quiet and gentle friend of Earl's. He is extremely intelligent and possesses a near Zen-like calmness. Apart from being African–American and perhaps the same age, Crabman is nothing like Shrimp.

Finally, there are several critical characters in *Karma!* that have no counterpart in *Earl*—most notably, Angel Man, Frankie's unborn son, and James Randson.

### e. Setting

Although both works take place in the present, the geographic and physical settings of *Earl* and *Karma!* are different. *Earl* is set in a suburban town named Camden. In the first episode, Earl makes reference to the fact that they have to drive into "the city." *Karma!*, in contrast, takes place in slums of New York City.

The physical settings are also different. In *Karma!*, the scenes are often set in dark and threatening locations, such as the subway, a deserted alley at night where Frankie is chased by a menacing dog, James Randson's house which is furnished with gothic paintings and filled with drug dealers, and the landfill where Frankie busts the climatic drug deal. The physical settings are for the most part gritty, dark, and somber, and reflect the dramatic mood of the screenplay.

In *Earl*, on the other hand, the physical settings are not ominous or threatening. Earl and Randy live in a cheap but comfortable motel, and Joy lives in a kitschy trailer park. Each setting has quirky characteristics that are set up for laughs— for example, in the motel where Earl lives, the maid rinses out plastic cups to be reused by guests; at the Crabshack—a local eatery where Earl and his friends hang out—Randy plays the "claw" videogame machine to win a live mouse instead of one of the stuffed animals; at Joy's trailer park, recliners are only allowed on the front lawn if they match the color of the trailer. The settings in *Earl* are used to reinforce the light-hearted, silly mood of the series. There are no unique physical settings in *Karma!* that also appear in *Earl*.[25]

Plaintiff notes that both works use rock music from the 1970s and 1980s in the background. However, the works do not use the same songs. Moreover, while the rock songs used in Plaintiff's work all relate to either the theme of karma or to religious themes—thereby reinforcing the religious undertones of the work—the rock songs used in *Earl* are not thematically similar to one another (e.g., compare Cindy Lauper's "Time After Time" and Lynyrd Skynyrd's "Steps"). Finally, the use of modern rock music in a work set in the present day is not a copyrightable expression.

---

**25.** Plaintiff notes that both works have scenes that take place in a bar/restaurant. However, a bar or restaurant is not a unique copyrightable setting.

### f. Mood and Pace

*Earl* is paced as a television show, with half-hour long episodes. Each episode is structured in the same basic manner with Earl choosing which wrong he is going to remedy, and then taking the necessary steps to see it through. Earl also narrates each episode with flashbacks to the points in time in which he committed the initial bad act. The events in the first season occur over the span of several years' time, as Joy has an infant in the pilot episode (Crabman's baby), and in a later episode (Barn Burner), Joy's kids appear to be the age of school children. Further, some of Earl's flashbacks bring the audience back to a time where Earl was a young child.

*Karma!*, on the other hand, is paced as a full-length feature film with the action reaching a crescendo at the end of the film. The entire screenplay unfolds over a matter of days, or at most weeks. There is only one flashback, and unlike in *Earl*, none of the characters act as a narrator.

*Earl* is a comedy. The mood of the series is light and cheerful. The main character is witty and sarcastic and often finds himself in humorous situations. While in some episodes, Earl attempts to remedy what would ordinarily be considered a serious wrong—for example, faking his own death—the events are always presented in a light-hearted and humorous way.

*Karma!* is written as a dramatic action film with a few humorous moments. The little humor in *Karma!* comes from Frankie's sarcasm, but the situations themselves are not comical. Frankie's past wrongs are not made light of; instead they have the potential to ruin the life of his unborn child. For the most part *Karma!* is a serious depiction of Frankie's spiritual awakening and his redemption.

### g. Dialogue

To support a claim of substantial similarity based on dialogue, the plaintiff must demonstrate "extended similarity of dialogue." *Olson v. National Broadcasting Co.*, 855 F.2d 1446, 1450 (9th Cir.1998). Ordinary words and phrases are not entitled to copyright protection, nor are "phrases or expressions conveying an idea typically expressed in a limited number of stereotyped fashions." *Narell v. Freeman*, 872 F.2d 907, 911–12 (9th Cir.1989). Here, the works have no similar dialogue.

Plaintiff's work is riddled with street slang that echoes the rough and gritty nature of the characters and New York City generally. For example, when Frankie first sees the picture of the angel, he exclaims, "well Mr. Guardian angel where are you now?! I stole your buddies [sic] wallet right under his nose.... Shit! I'm hip to your shit!!" (Rubin Decl., Exh. D,. pg. 82). Other examples include when street kids tell Frankie, "Look holmes! You're messin' with the wrong mother ..." (*Id.* at 106.) or when James Randolph tells Sonny, "It's my money that ... financed your bitches.... Good work Dawgs." (*Id.* at 169.) This hard-core street vernacular is unique to Plaintiff's work; it has no counterpart in *Earl*. Rather, the dialogue in *Earl* is principally sarcastic and witty. Every serious thought is followed up with a humorous quip, geared toward keeping the mood of the series light. The dialogue in the two works is not similar.

Plaintiff points to several alleged similarities in dialogue; however, when the works are examined, these similarities prove to be nonexistent or insubstantial. For example, Plaintiff notes that in both works a supporting character tells Frankie and Earl that they are forgiven for a past misdeed. Although each character uses some variation of the word "forgive," this is a standard, ordinary word that is not entitled to copyright protection. Similarly, Plaintiff notes that in one scene, Frankie

says "I'll be damned," while Earl says "Damn." These expressions are not the same, nor do they have the same meaning; regardless, these short phrases are not copyrightable. Third, Plaintiff points out that in *Karma!*, Frankie yells at Angel Man when he is frustrated with his journey to redemption, and Earl yells toward the sky at "karma" when he neglects his list and bad things happen to him. But the two characters do not use the same language, nor are the scenes otherwise similar.

Finally, Plaintiff notes that each work contains several references to Catholicism. However, none of the references include the same words. More importantly, the references to Catholicism play different roles in each work. As discussed above, in *Karma!*, religion is an important backdrop for Frankie's transformation. The religious references demonstrate that Frankie initially does not believe in God, but as the story progresses, he begins to have faith in the power of God, and eventually enters the afterlife as an angel. As Frankie himself relates, Frankie turns his life around by the "grace of God."

In *Earl*, on the other hand, the religious references are comedic and used to draw laughs. For example, most of the religious references Plaintiff points to occur in the episode "Quit Smoking." In that episode, Earl let his friend Donny take the fall for Earl's botched bank robbery, and when Donny goes to prison, he finds religion. Once Donny is released, Earl goes to Donny's house to make amends, and discovers that his former criminal friend is now a religious zealot. Donny's faith is portrayed as over-the-top and ridiculous—for example, Donny has a large tattoo of Jesus on his chest, and peers through the collar of his shirt to ask Jesus for advice. Donny also asks Earl if he would like to see that tattoo of Moses parting the red sea on Donny's buttocks, and Donny's

mother has Earl read to her from a 4–foot–thick Bible with enlarged print. In a later episode also featuring Donny, Donny says, "Oh, I want Jesus to see this," and unbuttons his shirt to reveal the tattoo. The remaining religious references are also used for comedic effect—e.g., Randy dresses as a nun, and Earl's father tells door-to-door missionaries that "for the last time, we already have a lord." Earl himself does not appear to be religious, nor does he take Catholicism seriously. In short, unlike in Plaintiff's work, the religious references in *Earl* are not serious, and they bear no relation to Earl's karmic realization or his journey to be a better man.

## IV. CONCLUSION

For the reasons stated above, the Court holds that Plaintiff has not introduced sufficient evidence, beyond pure speculation and conjecture, to establish a triable issue of fact regarding Defendants' access to Plaintiff's screenplay. Additionally, even assuming arguendo that there is a triable issue regarding access, no reasonable jury could conclude that *Karma!* and *Earl* are substantially similar. For these reasons, the Court GRANTS Defendants' Motions for Summary Judgment.

IT IS SO ORDERED.